BANK OF POPLAR BLUFF and Mary K. Vinson, Respondents,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Appellant.

No. 14617.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 23, 1986.

Motion for Rehearing or Transfer Denied Jan. 14, 1987.

Application to Transfer Denied Feb. 17, 1987.

William J. Toppeta, Rena Friedlander, New York City, and John L. Oliver, Jr., Oliver, Oliver, Waltz & Cook, P.C., Cape Girardeau, for appellant.

Stephen E. Walsh, Summers, Cope & Walsh, P.C., Poplar Bluff, for respondents.

CROW, Chief Judge.

Bank of Poplar Bluff ("the Bank") and Mary K. Vinson ("Mrs. Vinson") sued Metropolitan Life Insurance Company ("Metropolitan") for money allegedly owed under a policy insuring the life of William D. Vinson ("Mr. Vinson"). The cause was tried by the court without a jury, on an agreed statement of facts. Judgment was entered in favor of the Bank and against Metropolitan for $12,769.34, but in favor of Metropolitan on Mrs. Vinson's claim. Metropolitan appeals.

On September 5, 1975, Metropolitan issued policy number 750 917 397 A ("the policy"). Mr. Vinson was the named insured and the owner; Mrs. Vinson was the

---

beneficiary. The policy, a "twenty year reducing term life insurance policy," was in the initial amount of $50,000. The policy required a premium of $17.50 to be paid each month for 20 years. Premiums were paid by a "check-o-matic" plan under which Metropolitan drew a draft each month on a checking account of Mr. and Mrs. Vinson in another bank.

The policy provided, among other things: "This contract is made in consideration of the payment of premiums as specified in this policy.

.    .    .    .    .

Premiums are payable in the amount and for the number of years shown in the Premium Schedule ... or until the prior death of the Insured.

.    .    .    .    .

All premiums are payable on or before their due dates....

The payment of a premium will not maintain this policy in force beyond the next premium due date, except as otherwise provided. Any premium not paid on or before its due date will be in default. A grace period of 31 days will be granted for the payment of each premium after the first, during which period the policy will continue in force.

.    .    .    .    .

This policy may be assigned. If the assignment is absolute, all rights of the Owner ... [and] any Beneficiary ... will be automatically transferred to the assignee. If the assignment is collateral, such rights will be transferred only to the extent of the assignee's interest. However, an assignment will not be binding upon the Company unless made in writing and until filed at the Home Office...."

On or about July 17, 1978, Mr. and Mrs. Vinson borrowed money from the Bank and, in connection with that transaction, executed an instrument captioned "COLLATERAL ASSIGNMENT." Their signatures on that instrument (a printed form supplied by Metropolitan) were witnessed by a Metropolitan "field agent." The instrument, hereafter referred to as "the assignment," provided that the policy and all claims, options, privileges, rights, title, and interest therein were assigned to the Bank, except that the following rights were excluded so long as the policy had not been surrendered: (1) the right to collect from Metropolitan any disability benefit payable in cash that did not reduce the amount of insurance, (2) the right to designate and change the beneficiary, and (3) the right to elect any optional mode of settlement permitted by the policy or allowed by Metropolitan.

The assignment further provided that the policy was to be held as collateral security for any and all liabilities of the Vinsons to the Bank. The Bank agreed, among other things, that any balance of sums received under the policy from Metropolitan remaining after payment of the Vinsons' liabilities to the Bank would be paid by the Bank to the persons entitled thereto under the terms of the policy.

Additionally, the assignment provided that the Bank would be under no obligation to pay any premium or other charges on the policy, but that any such amounts paid by the Bank from its own funds would become a part of the liabilities secured by the policy.

The assignment was sent to Metropolitan, where it was recorded and filed July 25, 1978. Metropolitan acknowledged receipt to the Bank on a form that stated, in pertinent part:

"This form of assignment is offered solely as an accommodation.... Metropolitan ... is not a party to this assignment and does not assume any responsibility for its validity or sufficiency."

Nothing of consequence occurred during the ensuing five years, during which Metropolitan continued to collect the monthly premiums through the "check-o-matic" plan.

On September 2, 1983, Metropolitan presented to the drawee bank a draft for the premium due September 5, 1983. That draft was returned to Metropolitan, unpaid,

on September 22, 1983, bearing the notation "Payment Stopped." At that time, the value of the policy was $32,500.

Metropolitan notified Mr. Vinson that the policy would be cancelled for nonpayment of the premium. No such notice was sent to the Bank. The September premium was never paid, and, upon expiration of the 31–day grace period, the policy lapsed and was cancelled effective October 6, 1983.

Metropolitan notified Mr. Vinson of the cancellation, but did not notify either Mrs. Vinson or the Bank.

Mr. Vinson died December 26, 1983. At that time, the amount payable under the policy would have been $32,500. The balance owed the Bank by the Vinsons on their loan was $12,769.34.

On January 23, 1984, Mrs. Vinson filed a claim with Metropolitan for the death benefits. Metropolitan denied the claim on the ground that the policy had been cancelled October 6, 1983. Metropolitan did, however, pay the Bank, as collateral assignee, $194.59, representing dividends earned on the policy.

The Bank and Mrs. Vinson filed this suit, seeking $32,500 plus interest from September 5, 1983. The trial court held:

"[The] assignment entitled the ... Bank to notice of cancellation which it did not receive. The assignment clause of the policy ... limits the recovery to the assignee's interest, to the sum of ... $12,-769.34.... The notice to the decedent of the policy cancellation for non-payment of premium precludes recovery by his beneficiary, [Mrs. Vinson]."

Judgment was correspondingly entered, and Metropolitan filed this appeal. Mrs. Vinson did not appeal.

Metropolitan's first point states:

"The trial court erred in granting judgment for the ... Bank because there is no provision in the Missouri statutes, the insurance policy, or the collateral assignment requiring the insurer to notify the collateral assignee Bank of a default in premium payment or cancellation of the policy, and there was no conduct by Met-

ropolitan which gave rise to a duty to provide such notice to the Bank."

■ In considering the point, we must first take note of §§ 375.002 and 375.003, RSMo 1978. Section 375.002 provides, in pertinent part:

"1. A notice of cancellation of a policy shall be effective only if it is based on one or more of the following reasons:

(1) Nonpayment of premium...."

Section 375.003 provides, in pertinent part:

"1. No notice of cancellation of a policy to which section 375.002 applies shall be effective unless mailed or delivered by the insurer to the named insured at least thirty days prior to the effective date of cancellation. However, where cancellation is for nonpayment of premium at least ten days' notice of cancellation shall be given...."

The Bank and Mrs. Vinson, henceforth referred to collectively as "respondents," maintain that § 375.002 "gives an insured a right of notice of cancellation of an insurance policy," and that nothing in the statute "prohibits or limits the insured's ability to assign his right of notice." Respondents insist that Mr. Vinson's right of notice, "implicit in this policy by virtue of the Missouri Statutes," was assigned to the Bank by the assignment.

It is evident, of course, that if §§ 375.002 and 375.003, *supra*, made it the duty of Metropolitan to send Mr. Vinson a notice of cancellation, we will be obliged to decide (a) whether Mr. Vinson's right to such notice was assignable and, if so (b) whether the assignment effectively assigned such right to the Bank.

Metropolitan, however, cites in its reply brief § 375.001, RSMo 1978, which provides, in pertinent part:

"As used in sections 375.001 to 375.008 the following words ... mean:

.    .    .    .    .

(4) 'Policy', a contract of insurance providing fire and extended coverage insurance, whether separately or in combination with other coverages, on

owner-occupied habilitational property not exceeding two families...." [1]

Metropolitan argues that § 375.001(4), above, makes it clear that §§ 375.002 and 375.003 do not apply to life insurance policies. Consequently, says Metropolitan, the requirements under the latter two statutes for notice of cancellation for nonpayment of premium are inapplicable to this case. Furthermore, asserts Metropolitan, "There is no other Missouri statute which requires notice to an insured or insured's assignee under a personal life insurance policy of nonpayment of premium or cancellation of the policy."

We agree with Metropolitan that by reason of § 375.001(4), the statutes relied on by respondents (§§ 375.002 and 375.003) do not apply to the policy in issue here. That being so, those statutes imposed no duty on Metropolitan to give Mr. Vinson notice of cancellation of the policy, and he was therefore vested with no right of notice *under those statutes* which he could assign to the Bank or to anyone else.

Additionally, respondents do not cite, and our independent research has not found, any other Missouri statute that required Metropolitan to give notice of the default in the payment of the premium or the cancellation of the policy to either Mr. Vinson or the Bank. Metropolitan is thus correct in averring that it had no *statutory* duty to give such notice.

■ Having determined that much, our next inquiry is whether the *policy* and the *assignment,* individually or collectively, created a duty on the part of Metropolitan to notify the Bank about the default in the payment of the premium or the cancellation of the policy. We find nothing in either of those documents obligating Metropolitan to give the Bank such notice, and respondents, with praiseworthy candor, state in their brief, "Neither the policy itself, nor the assignment, contained any express provision requiring Metropolitan ... to notify

the insured of nonpayment of premium or cancellation of the policy."

It is therefore manifest that nothing in the policy or the assignment compelled Metropolitan to notify the Bank that the September 5, 1983, premium had not been paid or that the policy had been cancelled by reason thereof.

Even so, say respondents, "The conduct of Metropolitan in providing to its insured and its insured's intended assignee a printed form of assignment, prepared by or for Metropolitan, with instructions for use in connection with the assignment, which was then filed and accepted by the insurer gave rise to a duty to either *affirmatively* state in its own form that it did not consider itself bound to give notice to the assignee, or to actually notify the assignee."

The primary case cited by respondents in support of that hypothesis is *Estate of Coate,* 98 Cal.App.3d 982, 159 Cal.Rptr. 794 (1979). There, a debtor acquired a decreasing term life insurance policy, naming his creditor as primary beneficiary. The debtor also executed a collateral assignment of the policy to the creditor, and the assignment was recorded by the insurer. Thereafter, the insurer sent premium notices to the debtor, but not to the creditor. A quarterly premium due January 1, 1976, was not paid. A notice by the insurer to the debtor went unheeded, and the policy was terminated. Thereafter, the insurer sent the debtor an offer to reinstate the policy upon payment of the delinquent premium and completion of a reinstatement application. That likewise went unheeded. The debtor died April 11, 1976. At that time, the death benefit under the policy was $44,781.50. The insurer refused to pay. The creditor and the executor of the debtor's estate sued. The trial court granted summary judgment in favor of the insurer.

The appellate court noted that although a statute had been enacted by the California

---

1. The word "habilitational" in the above excerpt from § 375.001(4), RSMo 1978, is apparently a printer's error. The statute was enacted as Senate Bill 300 at the First Regular Session of the

Seventy-ninth General Assembly in 1977. As the bill appears in the session laws, the word is "habitational." Laws 1977, p. 572.

legislature requiring notice to an assignee prior to an attempted lapse of an insurance policy, the statute applied only to assignments executed after the assignment in the subject case. Moreover, the creditor and executor, in the trial court, had relied only on the language of the assignment. Consequently, said the appellate court, the question was whether, prior to enactment of the statute, insurance companies had a duty to give written notice to a creditor assignee of a life insurance policy as a precondition to the lapse of the policy, an issue of first impression in California. 159 Cal.Rptr. at 796.

The assignment in *Coate* was remarkably similar to the one in the case before us, in that it transferred to the creditor all rights in the policy except three rights like the three excepted in the Vinsons' assignment. The opinion in *Coate* stated that *if* the debtor had the right to receive notices of premiums, notices of intended lapse and offers of reinstatement, such right passed by the assignment to the creditor. The opinion added that if the insurer had meant to exclude from the assignment the right to receive such notices, it should have unambiguously set forth such excepted rights in the assignment.

The opinion then noted a California statute providing that stipulations necessary to make a contract reasonable are implied in respect to matters concerning which the contract manifests no contrary intention. The opinion reasoned that a duty of an insurer to give timely notice should be implied in order to make the insurance contract reasonable. The assignment, said the court, would be of dubious value to the creditor if notice of policy lapse and the right to reinstatement were not extended to him. 159 Cal.Rptr. at 797. The judgment was reversed.

*Coate*, as we interpret it, supplies no authority for sustaining the judgment in the instant case. *Coate* relied primarily on the California statute requiring that stipulations necessary to make a contract reasonable were implied as to matters concerning which the contract manifested no con-

trary intention. That element is missing in the instant case.

A Missouri case resembling the instant case in some respects is *Missouri Cattle Loan Co. v. Great Southern Life Ins. Co.,* 330 Mo. 988, 52 S.W.2d 1 (1932). There, an insurer, in 1919, issued a life insurance policy to one Russell, payable to certain named beneficiaries. Russell paid the annual premiums up to and including the one due June 5, 1922. Later that year he assigned the policy to a creditor to secure a debt. Notice of the assignment was given to the insurer. The creditor informed the insurer that it would thereafter pay the annual premiums, and asked that future notices of maturity of premiums be mailed to the creditor. The insurer replied that premium notices would be forwarded to the creditor as requested.

In December, 1924, Russell executed a second assignment, transferring to the creditor all right, title, and interest in the policy. Notice of that assignment was likewise given to the insurer. The insurer, up to and including 1925, regularly sent notices of premiums due to both Russell and the creditor. The creditor paid the premiums as they fell due, including the one due June 5, 1925.

The annual premium due June 5, 1926, was not paid, and the insurer declared the policy cancelled. In December that year, the creditor, according to its evidence, discovered by an audit of its books that it had failed to pay the premium. The creditor immediately wrote the insurer, offering to pay the premium, with interest, and requesting that the policy be continued in force. The insurer replied that the policy would not be reinstated except upon a medical examination of Russell acceptable to the insurer. The creditor learned that Russell could not pass a medical examination, but nonetheless tendered the sum that had become due June 5, 1926, with interest. The tender was refused. The creditor thereupon sued to have the cancellation set aside and to have the policy adjudged in force.

The creditor's evidence showed that neither Russell nor the creditor received any notice of the maturity of the June 5, 1926, premium, nor any notice that the policy had been cancelled. The insurer's evidence tended to show that such notices were sent. The trial court resolved that fact issue against the insurer.

The creditor argued that it had relied on the assurance given by the insurer after the first assignment that the latter would give timely notice of the due dates of the premiums. The insurer argued that it owed no duty to Russell or the creditor to notify either of the due date of the June 5, 1926, premium, and that the creditor's failure to pay the premium when due justified cancellation of the policy.

The trial court found that the insurer, by its written assurance and its course of conduct, had led the creditor to believe that the insurer would give the creditor timely notice of the due dates of the premiums so that the creditor could pay them, and that by reason thereof the creditor had a right to believe it would receive such notice so that it could make the necessary payments and avoid forfeiture of the policy. The trial court decreed that upon tender to the insurer of all sums due, with interest, the policy would be in full force and effect. The insurer appealed.

The Supreme Court of Missouri observed:

"Neither the policy nor the note [by which the creditor had paid a portion of the earlier premium] by its terms requires the insurer to notify the [creditor] of the due date of premiums or interest on the note. [The creditor] does not so contend. Its contention is that the [insurer] expressly promised [the creditor] to give it timely notice in advance of the due date of the payments to be made, knowing that [the creditor] would rely upon receiving such notice, and that prior to 1926 [the insurer] habitually did give such notices, and that having by its promise and its conduct induced [the creditor] to rely upon receiving notice it could not take advantage of its failure to

give same and declare a forfeiture without having first informed [the creditor] that the notices would be discontinued." 52 S.W.2d at 7.

After discussing a number of authorities, the Court stated:

"That an insurance company may, by a course of dealing which the insured has been induced to rely upon, create an estoppel to enforce a forfeiture for the insured's failure to pay promptly, notwithstanding the policy provides for such forfeiture, is in effect held in the following cases [citing authorities]. . . .

In most of the cases to which we have referred the estoppel was created by a custom relied upon by the insured and without an agreement to give notice or to waive prompt payment of premiums. It is not necessary in this case for us to hold that such custom reasonably relied upon would alone create such estoppel. We have here, in addition to the uniform custom, the express assurance by [the insurer] to [the creditor], in the correspondence . . ., that it would give such notices; a promise never withdrawn and in compliance with which it gave the notices until 1926, when, without warning, it failed to do so, . . . and declared the policy forfeited, knowing all the while, as it must have known, that [the creditor] reasonably relied upon such notification. To hold in such circumstances that the insurer may thus take advantage of its own breach of good faith to the injury of the policyholder would be grossly unjust. We will not so write the law, and we have found no case in which, under such circumstances, it has been so written." 52 S.W.2d at 10.

The Supreme Court affirmed the judgment.

Another Missouri case, *Scheele v. Lafayette Bank*, 120 Mo.App. 611, 97 S.W. 621 (1906), should also be mentioned. While the facts are somewhat intricate, it is sufficient for our purposes to state that under a policy insuring the life of one Scheele, five-sixths of the face amount would be paid at his death to a creditor, and the remaining one-sixth would be paid to his daughter.

The creditor agreed with Scheele that it (the creditor) would pay all premiums, dues or charges on the policy. Over a year later, the insurer sent Scheele a notice that a payment was due, but Scheele ignored it and the policy lapsed for nonpayment. Efforts by Scheele and the creditor to have the policy reinstated were unsuccessful, and Scheele died three years later. His daughter sued the creditor for breach of its agreement to pay the premiums, seeking judgment for one-sixth of the face amount of the policy. The trial court entered judgment for the daughter. Affirming the judgment, the opinion stated:

"It is contended that, as the notice of [the premium] call ... was mailed to and received by ... Scheele, his failure to notify the [creditor] released the latter from its obligation to pay the call. It is nowhere stipulated in the contract that Scheele should give the [creditor] notice of the calls as made. The policy held by the [creditor] notified it that the ... premiums were payable at the home office of the [insurer] ... within thirty days from the first week day of [certain designated months]. This was sufficient notice, and it was the duty of the [creditor] to make periodical inquiries of the [insurer] as to the amount of the premiums, in time to pay them as they became due. It made no inquiry and took no steps looking to a payment of these premiums, but let them go by, and permitted the policy to lapse; thereby depriving [the daughter] of her right to receive one-sixth of the face of the policy on the death of her father." 97 S.W. at 625.

While *Scheele* indicates it was the creditor's duty to make periodic inquiries about the premiums, it must be remembered that the dispute in *Scheele* was between the insured's daughter and the creditor, not between the creditor and the insurer. There was, therefore, no need for the court to consider whether the insurer owed any duty to the creditor to send premium notices.

A more recent Missouri case, *Charter Bank of Boonville v. Shelter General Ins.*, 664 S.W.2d 44 (Mo.App.1984), while not in-volving a life insurance policy, is nonetheless worthy of mention. Charter Bank's predecessor was named as loss payee in an insurance policy covering a truck owned by one Whitworth and his spouse. The policy provided, *inter alia*, that upon cancellation or termination of the policy or the coverages insuring the loss payee's interest, the insurer agreed to give written notice thereof mailed to the loss payee's address shown in the declarations, and such coverages as respects the loss payee's interest would continue for ten days following the mailing of such notice. The policy further provided that if termination or cancellation was for nonpayment of premium, the loss payee could elect to pay the premium to keep in effect the coverages insuring its interest.

The Whitworths did not pay the premium to renew the policy upon its expiration, July 23, 1979. On July 30, 1979, Whitworth bought another truck, again financing it through Charter Bank, as a replacement for the first truck. No notice was sent to the insurer of the acquisition of the replacement truck, and no insurance was ever procured for it. On August 18, 1979, Whitworth caused collision damage to the replacement truck. On August 20, 1979, the insurer mailed a notice to Charter Bank that its interest, if any, as loss payee of the policy would be terminated and cancelled ten days thereafter because the premium had not been paid. On August 30, 1979, Charter Bank notified the insurer of Whitworth's purchase of the replacement truck, and of its wreck on August 18. Charter Bank tendered the premium necessary to keep coverage in force. The insurer denied liability and rejected the tender. Charter Bank sued, and the trial court entered judgment in Charter Bank's favor for the reasonable repair cost of the replacement truck.

The appellate court held that the Whitworths' coverage expired July 23, 1979, by reason of their failure to pay the premium. As to Charter Bank, however, the policy remained in force up to the time of the loss, as Charter Bank had not been given a notice of cancellation or termination, nor

afforded the election within ten days thereafter to pay the premium and continue the policy in force. Because of a clause in the policy providing coverage for newly acquired vehicles for 30 days after acquisition, the damage to the replacement truck was covered. Accordingly, the judgment was affirmed.

From the three Missouri cases discussed above, we see that an insurer has been held to have a duty to give an assignee of a life insurance policy notice of premiums due where the insurer had assured the assignee in writing that it would do so, and had in fact done so for a number of years (*Missouri Cattle Loan Co.*); that a creditor-beneficiary of a life insurance policy who had agreed with the insured that it would pay the premiums on the policy was held to have a duty—as to another beneficiary of the policy—to make periodic inquiries to ascertain that all premiums were paid when due (*Scheele* ); and that where a loss payee of a motor vehicle insurance policy had a right *under the policy* to notice of termination, the insurer could not escape liability to the loss payee where no such notice was given, even though the policy was cancelled as to the named insureds because of their failure to pay a premium (*Charter Bank* ).

Obviously, the facts in the instant case do not match the facts in any of those cases. Neither side in this appeal cites a Missouri case that coincides factually with the instant case, and we have been unable to find one. There is, however, a Wisconsin case with facts virtually identical to those here: *Sorenson v. National Life Insurance Co.*, 56 Wis.2d 92, 201 N.W.2d 510, 68 A.L.R.3d 354 (1972). There, an insurer, on August 31, 1967, issued a 5–year renewable term life insurance policy to one Stowe. On November 13, 1967, Stowe and his wife assigned the policy to certain creditors as collateral security. The assignment gave the creditors the right to collect the policy proceeds up to the amount of the debt owed them by the Stowes, with the excess proceeds to be paid by the creditors to the persons entitled thereto under the policy. The assignment was made on a printed form published by the insurer for that purpose. The assignment provided, among other things, that the creditors had no obligation to pay any premium or other charges on the policy, but that any such amounts so paid by the creditors from their own funds would become a part of the liabilities secured by the policy. Notice of the assignment was filed and recorded at the insurer's home office November 21, 1967.

Stowe failed to pay a semiannual premium due February 28, 1969, as a result of which the insurer terminated the policy. Stowe died February 3, 1970. Thereafter, the creditors demanded the policy proceeds, but the insurer denied the claim. The creditors sued. The insurer demurred to the creditors' complaint; the trial court sustained the demurrer. On appeal by the creditors, the Supreme Court of Wisconsin stated that the sole issue was whether the assignee of a life insurance policy is entitled to receive notice of premiums due or lapse notices, where such notice is not specifically required by statute or under the terms of the policy or the assignment.

The opinion asserted that the general rule was set forth in 5 Couch, Insurance 2d § 30:143, where it is said:

"In the absence of any statute or contract of the insurer to the contrary or conduct of the insurer giving rise to a duty to notify the assignee, there is no duty on the insurer to notify an assignee of the policy of premiums or assessments due thereon."

In support of its statement that this was the prevailing view, the opinion in *Sorenson* cited eight cases, one of which, interestingly enough, was *Scheele*, 97 S.W. 621, discussed *supra.*

In *Sorenson* (as here) no statute applied, and the parties in *Sorenson* (as here) acknowledged that there was no explicit provision in either the policy or the assignment which called for premium or lapse notices to be sent to the assignees.

In *Sorenson*, the application for the policy, which became a part thereof, had asked to whom premium notices should be sent.

Stowe had checked the box indicating "Insured," and had listed his address. The trial court found that this entitled Stowe to receive premium notices. In that respect, *Sorenson* differs from the instant case, in that here no mention of premium notices appears in the policy and, indeed, notices were unnecessary inasmuch as the monthly premiums were paid by the "check-o-matic" plan. Thus, the Bank in the instant case is in an even weaker position than the creditors in *Sorenson*.

The creditors in *Sorenson* argued that Stowe's right to receive premium notices was transferred to them by the assignment. The appellate court rejected that contention. We need not discuss the rationale on that point because, as we have seen, Mr. Vinson in the instant case possessed no such right.

The aspect of *Sorenson* crucial to the instant case is that the creditors in *Sorenson* also contended that by the totality of its conduct, the insurer consented to the assignment and could not escape the obligation to pay the policy proceeds to the creditors. Specifically, the creditors argued that by recordation of the assignment on a form provided by the insurer for that purpose, the insurer was contractually bound to give premium or lapse notices to the creditors. The appellate court rejected that argument, noting that the insurer returned no acknowledgement, and it did not appear there was any other act or omission on its part which would evidence its intent to be contractually bound to give notice to the creditors.

The opinion pointed out that in relying on Stowe to pay the premiums, the creditors were not relying on the insurer to send them premium notices. Some 27 months elapsed between the assignment and Stowe's death. It had to be apparent to the creditors that premiums were falling due during that interval and they (the creditors) were not receiving premium notices. The creditors could have protected themselves by requiring Stowe to submit evidence of payment each time a premium fell due. The opinion further noted that in

light of the 31-day grace period afforded by the policy, it would have been easy for the creditors to either inquire of the insurer whether premiums had been paid, or at least attempt to enter into a separate agreement with the insurer whereby it would send notice of premiums due and notice of any default. Judgment in favor of the insurer was affirmed.

The similarities of *Sorenson* and the instant case are readily apparent. In the instant case, the Bank had to have realized that a premium was falling due every month during the five and a half year interval between the assignment and Mr. Vinson's death, and that it was receiving no premium notices. The Bank must also have realized that inasmuch as the "check-o-matic" arrangement was in place for payment of the premiums, and the assignment specified that the Bank had no obligation to pay them, there was no reason for Metropolitan to send the Bank premium notices.

It is likewise obvious that there was no need for Metropolitan to send premium notices to Mr. Vinson, as the premiums were being paid automatically and it would require an affirmative act by Mr. or Mrs. Vinson, i.e., stopping payment, to prevent a premium being paid. By such act, Mr. or Mrs. Vinson would, of course, realize the premium was not paid.

Furthermore, premiums had been paid regularly for more than five years after the assignment. When payment was stopped on the draft for the September 5, 1983, premium, Metropolitan could have reasonably assumed that the assignment had served its purpose and that Mr. Vinson, for his own reasons, no longer desired to maintain the policy in force and bear the expense thereof. There is no evidence that Metropolitan knew, in September, 1983, that any indebtedness still existed by the Vinsons to the Bank.

The Bank does not contend it ever asked Metropolitan to send it premium notices or notice of cancellation, and there is no evidence that any such request was ever made. Finally, Metropolitan's acknowledgement to the Bank that the assignment

had been received warned that Metropolitan was not a party thereto and assumed no responsibility for its validity or sufficiency.

In sum, the Bank can point to no conduct by Metropolitan from which the Bank could have reasonably inferred that Metropolitan would send the Bank notice that a premium was delinquent or that the policy had been cancelled for nonpayment.

*Sorenson* was followed in *Lewis State Bank v. Travelers Ins. Co.*, 356 So.2d 1344, (Fla.App.1978), a case with facts similar to those in the instant case and *Sorenson.* There was neither a statute nor a provision in the life insurance policy or the assignment requiring the insurer to notify the creditor-assignee that the policy had lapsed for nonpayment of premium. Additionally, there was no allegation that the insurer had engaged in any conduct which would tend to lead the creditor-assignee to rely justifiably on an expectation that it would receive notice of nonpayment of premiums. The opinion held there was no duty on the part of the insurer to notify the creditor-assignee of premiums due on the policy, or of the lapse thereof.

We find *Sorenson* and *Lewis State Bank* well reasoned, and we are persuaded that those cases should be followed in resolving the instant appeal. Accordingly, we hold that as a matter of law the circumstances in the record before us establish no duty on the part of Metropolitan to notify the Bank of nonpayment of a premium or cancellation of the policy. Metropolitan's first point is therefore meritorious, making it unnecessary for us to discuss Metropolitan's second point.

In reaching that conclusion, we do not overlook *Northwestern Bank of Commerce v. Employers' Life Insurance Company of America*, 281 N.W.2d 164 (Minn. 1979), cited by the Bank. There, however, the insurer had assured the creditor-assignee in writing that the insurer would, in the event of default in payment of a premium, notify the creditor-assignee in ample time for the latter to protect its collateral. The opinion held the insurer's promise enforce-able under the doctrine of promissory estoppel, ruling that the policy—to the extent of the deceased insured's debt to the creditor-assignee—would be considered in force even though it had lapsed for default in payment of a premium. No such promise was made by Metropolitan to the Bank in the instant case.

The authorities heretofore discussed, in our view, adequately express the relevant law; however, one interested in further treatment of the subject can find additional citations and analysis in the annotation, Obligation of Insurer to Give Assignee of Life Policy Notice of Premiums Due, 68 A.L.R.3d 360 (1976).

■ One other item requires attention before our task is complete. As an alternative theory of recovery, the Bank pleaded that Metropolitan had a duty to apply the accumulated dividends ($194.59) toward payment of the premiums falling due on and after September 5, 1983. Had Metropolitan done so, says the Bank, the policy would have remained in force until Mr. Vinson's death.

The answer to that contention is that the policy allowed three dividend options: (a) leave dividends to accumulate at interest, (b) apply dividends within the grace period toward payment of premiums, or (c) receive dividends in cash. In the agreed statement of facts, the parties stipulated that at no time did Mr. Vinson ever make an affirmative election of any option other than "(a)." Furthermore, there is no showing that the Bank ever attempted to exercise any dividend option. The policy provided that if no other option was elected within three months after the date a dividend became payable, the dividend would be applied under option "(a)." Consequently, the Bank's alternative theory of recovery is meritless.

That portion of the judgment awarding the Bank $12,769.34 against Metropolitan, and that portion of the judgment taxing the costs against Metropolitan are reversed. That portion of the judgment denying Mrs. Vinson's claim against Metropolitan is af-

firmed. Costs of this appeal are taxed against respondents.

GREENE, P.J., and A.J. SEIER, Special Judge, concur.

TITUS, J., not participating.